735 So.2d 921 (1999)
Sharon Ann GILPIN
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Donnell Abadie, Don L. Abadie and Gail H. Abadie, Individually and/or as Parents and Natural Tutors of a Minor, Don L. Abadie, Jr. and Don L. Abadie, Jr., Individually, and Lisa Kidd.
No. 99-CA-36.
Court of Appeal of Louisiana, Fifth Circuit.
May 19, 1999.
*922 Marta-Ann Schnabel, New Orleans, for Defendant/Appellant.
*923 Frederick J. Gisevius, Jr., Patrick H. Hufft, David E. Caruso, Jr ., New Orleans, for Plaintiff/Appellee.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
DALEY, Judge.
The plaintiff, Sharon Gilpin, filed suit against several defendants for injuries she sustained in an automobile accident. The accident occurred when Ms. Gilpin was stopped at an intersection. A vehicle driven by Don Abadie struck the vehicle behind Ms. Gilpin, which was being driven by Linda Kidd. The Kidd vehicle struck plaintiff's vehicle. The plaintiff filed suit against Mr. Abadie, his insurer, State Farm, and Ms. Kidd, as well as her insurer, State Farm. Ms. Gilpin later amended the suit to include her uninsured/underinsured motorist carrier, Government Employee Insurance Company, hereinafter referred to as GEICO. Ms. Kidd was determined not to be at fault in causing the accident and was dismissed from the suit prior to trial. Ms. Gilpin settled with State Farm in its capacity as Mr. Abadie's insurer for the $10,000.00 policy limit and was also dismissed from the suit. Ms. Gilpin prevailed in a jury trial against GIECO, and was awarded damages, attorneys fees and penalties. GEICO has appealed this judgment.

FACTS:
At the beginning of trial, the parties stipulated that Mr. Abadie was the sole cause of the accident. The parties also stipulated that Ms. Gilpin had settled with Mr. Abadie's insurer for the full amount of insurance available which permitted her to proceed against her uninsured motorist carrier, GEICO.
Ms. Gilpin testified that she suffered from scoliosis, a curvature of the spine, which required the insertion of a Harrington rod in 1964, at the age of sixteen. In 1984 Ms. Gilpin was injured in an automobile accident, which damaged the Harrington rod. She eventually had the rod replaced and her lower back was refused. She recovered from this injury and returned to work full-time as a Certified Registered Nurse Anesthetist. Ms. Gilpin testified she led an active lifestyle, exercising several times per week. The exercise regime strengthened the muscles in her back which led to better alignment of her spine, resulting in less discomfort from the scoliosis and rod.
Ms. Gilpin testified that on April 3, 1993, she was involved in another accident in which she was rear-ended. The accident occurred when the Abadie vehicle struck the Kidd vehicle, which in turn struck her car. Ms. Gilpin testified that the impact from this accident pushed her car forward almost an entire car length. Ms. Gilpin was driving a small BMW which sustained minor damage to the rear bumper.
Ms. Gilpin testified that the first thing she remembered after the accident was pain in her right knee. She testified that at the time of impact, her right foot was on the brake. She was unsure of whether her knee struck the dash board. On April 6, 1993, Ms. Gilpin visited Dr. Frederick Warren, who had treated her after her 1984 accident. Ms. Gilpin testified that she sought treatment from Dr. Warren because she had pain in her low back, neck, right shoulder, right knee, and right elbow. Ms. Gilpin explained that she had neck pain prior to the 1993 accident, but the character of the pain changed following the 1993 accident. Ms. Gilpin denied prior pain in her right knee. Dr. Warren suggested Ms. Gilpin seek treatment from Dr. Charles Johnson for her knee injury.
On April 20, 1993, Ms. Gilpin visited Dr. Johnson. Ms. Gilpin testified that at the time of this visit, she was experiencing such severe knee pain that she was unable to allow Dr. Johnson to examine her knee. Dr. Johnson prescribed pain and anti-inflammatory medications. One week later, she returned to Dr. Johnson's office, where her knee was examined. Ms. Gilpin testified that over the next several months she *924 had knee pain, and felt as though she had a piece of sand or pebble under her knee cap. During this time period, Ms. Gilpin developed a cardiac arrhythmia, requiring treatment with several drugs. She did not return to Dr. Johnson until March 1994. At that time she was having difficulty squatting, sitting down and getting back up, and getting in and out of her car due to knee pain. The distance she was able to walk on the treadmill was declining. Dr. Johnson suggested an arthroscopic surgery to determine the cause of her knee pain. Due to her recent cardiac problems, Ms. Gilpin was reluctant to undergo surgery at that time. After the cardiac anomaly stabilized, Ms. Gilpin had a facial peel, which resulted in her face being severely burned. She explained that she had to wait for the burn to heal before undergoing knee surgery.
In January 1995, Ms. Gilpin underwent arthroscopic knee surgery in which portions of her damaged cartilage were removed. This condition was diagnosed as chrondromalacia. Her knee pain has not resolved and she is unable to squat and has difficulty going up and down stairs. She testified that the knee pain has prohibited her from resuming her previous level of exercise.
Ms. Gilpin testified that her neck pain initially improved after the 1993 accident, but in July 1994, she noticed that she was having pain on the right side of her neck which radiated down her arm. Ms. Gilpin explained that she thought the pain in her neck could have been related to the fact that for several weeks following her facial peel, she had to sleep propped on pillows in an almost upright position. She sought treatment for this pain at Ochsner Clinic, which was the place of her employment.
Ms. Gilpin testified that in 1995, she moved to Virginia to care for her mother who was gravely ill. After settling in Virginia, she sought treatment from an orthopedist, Dr. Nichols, for continued pain in her knee and neck. Dr. Nichols prescribed physical therapy and diagnostic tests. She also sought treatment from a neurosurgeon, Dr. Fatehi, who prescribed Relafen, an anti-inflammatory medication, and Valium to be taken at night.
Due to the difficulty in performing her job duties, which include repetitive bending, lifting and squatting, Ms. Gilpin testified that she has returned to school to pursue a career in teaching.
Finally, Ms. Gilpin testified that she answered interrogatories propounded by GEICO relative to her injuries and treatment. She stated that GEICO never requested she be examined by a physician of their choosing, nor had GEICO made any type of offer to compensate her for her injuries.
Dr. Frederick Warren was accepted by the court as an expert in orthopedic surgery. He treated Ms. Gilpin following her 1984 accident. He testified that she returned to see him on April 6, 1993 following her involvement in an accident three days earlier. Dr. Warren testified that Ms. Gilpin complained of right knee pain, right elbow pain, low back pain, and pain between her shoulder blades. Although she did not specifically complain of neck pain, Dr. Warren explained that it is common for someone with a neck injury to complain of pain between the shoulder blades. Examination revealed full range of motion in the neck with pain on movement, and tenderness in her right knee. Dr. Warren diagnosed strained lumbar and cervical spine, and strained elbow and right knee. He prescribed muscle relaxants, anti-inflammatory medication, and pain medication.
Dr. Charles Johnson was accepted by the court as an expert in orthopedic surgery. Ms. Gilpin's first visit to his office was on April 20, 1993, for complaints of pain in the knee following an automobile accident. During this visit, Ms. Gilpin was so nervous that he was unable to perform a full examination of her knee. He prescribed anti-inflammatory medications and requested she return in one week. When *925 Ms. Gilpin returned Dr. Johnson testified that he was able to fully examine her knee. The examination was normal. Dr. Johnson testified that Ms. Gilpin was unable to state whether her knee struck the dashboard or whether she had her foot planted on the brake at the time of the accident; however, he later explained that either scenario could have resulted in the injury Ms. Gilpin developed. Approximately one month after her second visit, Ms. Gilpin called Dr. Johnson's office requesting a refill on her anti-inflammatory medications.
Dr. Johnson testified that in March 1994, Ms. Gilpin returned to his office, complaining of pain in her knee with popping and snapping under her kneecap. Examination revealed grinding under the kneecap on both flexion and extension. He diagnosed her condition as traumatic chondromalacia of the patella or kneecap, and recommended an arthroscope. Dr. Johnson testified that this condition develops several months to one year following trauma to the patella and explained:
...the articular cartilage, or the white glistening cartilage on the end of the bone, becomes soft and it loses its compressibility. And the purpose of the articular cartilage is to make a knee joint work smoothly. It is sort of like polished ceramic. When you have damage to the cartilage surface or the cartilage cells, they slowly degenerate and they become abnormal. And you developno longer a smooth surface. It becomes frayed and it looks similar to crab meat. And when it moves back and forth inside the knee, it pops and snaps and grinds and causes little particles of that cartilage to float around inside the knee, and the knee becomes irritated from the debris inside the knee.
Dr. Johnson testified that during the arthroscopic procedure, the end of Ms. Gilpin's bone was sanded down to make it smooth, portions of damaged cartilage were removed, and tissues under the patella were released to decrease the pressure on the patella. Ms. Gilpin was unable to work for four weeks following this procedure. Dr. Johnson opined that the injury to Ms. Gilpin's knee was caused by the April 1993 accident.
The last time Dr. Johnson examined Ms. Gilpin was in July 1995, just prior to the time she moved to Virginia. Dr. Johnson testified that Ms. Gilpin continued to experience pain in the knee and difficulty going up and down stairs. He explained that once a person has chondromalacia, they have a propensity to develop it again, which requires further surgery.
The videotape of the deposition of Dr. Glenn Nichols, an expert in orthopedic surgery, was played for the jury. Dr. Nichols testified that he examined Ms. Gilpin on June 11, 1996, at which time she complained of neck pain radiating to her right shoulder and arm, and right knee pain. Dr. Nichols testified that Ms. Gilpin told him she was involved in an accident in April 1993 at which time she had immediate pain in the right knee, right arm, right shoulder, and right neck. He further testified that Ms. Gilpin had undergone knee surgery, however, she continued to complain of knee pain, was unable to squat or kneel, had difficulty with stairs, and had grinding and stiffness in the knee. She also complained of persistent right neck pain and right trapezial pain which radiated to her right hand. She had numbness in her hand and difficulty lifting. Dr. Nichols testified that on examination, Ms. Gilpin had marked tenderness in the trapezius with palpable spasms, indicating an injury to this area. She had decreased range of motion in her neck, and tenderness in her right shoulder. The neurological examination of her right upper extremity was normal. Examination of her knee revealed full range of motion with grinding and pain. There were no significant arthritic changes on her knee x-rays. The cervical spine x-rays showed degenerative changes between the fifth and sixth vertebrae and narrowing of the foramen between the fourth and fifth, as well as the *926 fifth and sixth vertebrae. Dr. Nichols diagnosed chrondromalacia of the knee cap, and wanted to exclude the possibility of a ruptured cervical disc. He recommended she start physical therapy and undergo further diagnostic studies. Dr. Nichols ordered an MRI, which he testified showed a bulge between the fifth and sixth cervical vertebrae, causing her neck pain.
Dr. Nichols testified that Ms. Gilpin returned to his office six months later, with continued complaints of neck and right arm pain, with numbness and tingling in her right hand. Her knee pain had increased and the examination showed significant crepitus or grinding, and popping. Dr. Nichols testified that he recommended injections into the kneecap to reduce the pain and inflammation.
In February 1997, Ms. Gilpin returned to Dr. Nichols office. Dr. Nichols testified that he injected Ms. Gilpin's knee with an anesthetic agent and cortisone to relieve the pain and reduce the inflammation in this area. Examination on this date showed decreased range of motion and significant grinding in the knee.
Dr. Nichols testified that the knee injury was caused by trauma sustained in the 1993 accident. He explained:
... there is initial impact to the cartilage, the protein matrix which makes up the cartilage starts to break down, the cartilage begins to absorb more water, and then at some point it gets very soft and starts to crack. And that's when you start to notice the symptoms. And that is usually somewhere some months down the road after the accident, actually.
Dr. Nichols testified that there is no cure for chondromalacia, which will worsen as Ms. Gilpin gets older. She will need future surgery to remove the broken cartilage and will probably need a total knee replacement.
Dr. Nichols testified that Ms. Gilpin's neck problems are not related to her scoliosis or rods in her back. Rather, he testified that it is more probable than not the cause of Ms. Gilpin's present neck pain is the trauma she sustained in her cervical region in the 1993 accident.
The videotaped deposition of Dr. Nasrollah Fatehi, an expert in the field of neurosurgery, was also played for the jury, Dr. Fatehi testified that he examined Ms. Gilpin in July 1996 for complaints of right sided neck pain, right shoulder and upper arm pain, with altered sensation. He reviewed her most recent MRI which showed flattening of the cervical lordotic curve, mild degenerative changes at the level of the fifth and sixth cervical vertebrae, and slight posterior bulge of the disk material. On examination, Dr. Fatehi noted normal range of motion in the neck, with tenderness in the right brachial plexus. Dr. Fatehi testified the neck pain is related to the 1993 accident. He prescribed Relafen, an anti-inflammatory medication, Valium, and Tylenol for pain. Dr. Fatehi examined Ms. Gilpin on two other occasions in 1996, and found that she continued to complain of neck discomfort. He diagnosed her condition as chronic cervical sprain, and opined that she may continue to have constant or recurring pain.
Plaintiff also presented testimony from Dominick Caserta, with whom she exercised prior to the 1993 accident. Mr. Caserta testified that he and Ms. Gilpin exercised by participating in power walking and lifting weights. He testified that Ms. Gilpin experienced no problems with her knee during that time.
Two passengers in the Kidd vehicle, Ricky and Michelle Camet, testified that they were hit very hard from the rear. Both witnesses were unsure of the force of the impact with the Gilpin vehicle.
The defense presented no witnesses at trial.
At the conclusion of trial, the jury awarded Ms. Gilpin as follows:

*927
Past Medical Expenses $12,000.00
Future Medical Expenses $75,000.00
Past and Future Physical Pain and Suffering -0-
Past and Future Mental Pain and Suffering -0-
Physical Impairment $75,000.00

The jury also responded affirmatively to the question of whether GEICO was arbitrary and capricious in failing to tender a reasonable sum unconditionally to Ms. Gilpin.
In entering judgment on the jury verdict, the trial court ordered that the liability of GEICO for the judgment was limited to the GEICO policy limit of $100,000.00.
The plaintiff filed a "Motion to Assess Statutory Penalties and Attorney Fees Pursuant to Finding of Jury and to Tax Costs." The court awarded the plaintiff penalties in the amount of $40,500.00, attorneys fees in the amount of $54,000.00, and costs in the amount of $7,684.54.

DISCUSSION
GEICO has appealed, urging several assignments of error. First appellant argues the jury's answers to interrogatories are not supported by the evidence. Appellant contends the jury erred in awarding $12,000.00 in past medical expenses, when the actual amount of medical bills entered into evidence totaled $10,631.74.
The plaintiff testified that the medical bills admitted into evidence did not include expenses for over the counter medication, and other items such as a special pillow. Generally, a plaintiff's allegation of medical expenses which are supported by bills, is sufficient to support an award for these expenses. Ausustus v. St. Mary Parish School Bd., 95-2498 (La.App. 1st Cir.6/28/96), 676 So.2d 1144. However, there were no bills introduced to support these alleged expenses. Accordingly, we reduce the award of past medical expenses from $12,000.00 to $10,631.74.
Appellant argues the award of $75,000.00 for future medical expenses is excessive and also unsupported by the evidence. We agree.
In order to recover future medical expenses, the plaintiff must support her allegation of future medical expenses with medical testimony and estimation of probable costs. Hopstetter v. Nichols, 98-185 (La.App. 5th Cir.7/28/98), 716 So.2d 458. Both Dr. Johnson and Dr. Nichols testified that the chrondomalacia in plaintiff's knee was caused by the 1993 accident. The physicians further testified that this condition will require future medical care, including one more arthroscopic procedure and probably a total knee replacement. Dr. Nichols estimated the cost of future arthroscopic surgery to be $15,000.00, and the cost of a total knee replacement to be $25,000.00. Based on this testimony, we find the amount awarded to plaintiff for future medical expenses to be excessive and unsupported by the record. Accordingly, we decrease the award of future medical expenses from $75,000.00 to the amount supported by the record, which is $40,000.00.
Next, appellant argues the jury erred in awarding damages for physical impairment, while not awarding damages for pain and suffering. Appellant contends the jury "seems to be saying that Ms. Gilpin was not harmed beyond the cost of her medical treatment. Yet, an award for `physical impairment' is more than just an award for treatment." We disagree with this position. Dr. Johnson and Dr. Nichols testified at length regarding Ms. Gilpin's inability to kneel and squat, difficulty climbing and descending stairs, and difficulty sitting down and arising from a sitting position. Ms. Gilpin also testified as to her difficulty in getting in and out of a car as well as her inability to exercise at her previous level, which has had a negative affect on her congenital back condition. She further testified as to the effect the physical limitations due to her knee and neck pain have on her ability to perform her job as a nurse anesthetist. Based on this testimony, we find the award for physical impairment to be appropriate.
*928 GEICO also argues there is no evidence that they were arbitrary and capricious and the jury's ruling on this issue is manifest error, unsupported by the evidence. We find no merit to this argument.
Ms. GILPIN testified that she answered interrogatories propounded by GEICO relative to her injuries. She further testified that she was deposed by the attorney representing GEICO, during which she told him of her injuries. Ms. Gilpin testified that GEICO never requested she undergo an examination by a physician of their choosing, nor did they offer any amount of compensation for her injuries. Moreover, we note that GEICO failed to present any evidence whatsoever to refute the testimony of Ms. Gilpin's treating physicians that her knee and neck injuries were caused by the April 1993 accident. Hence, we find the jury's determination that GEICO was arbitrary and capricious is supported by the evidence.
In ruling on the plaintiff's Rule to Tax Penalties and Costs, the trial court stated that based on the jury's finding that GECO was arbitrary and capricious, it had the authority to order sanctions under La. R.S. 22:1220[1]. The trial court awarded "penalties in the amount of $40,400.00, attorneys fees in the amount of $54,000.00," plus costs.
GEICO argues the trial court was only authorized to award penalties pursuant to R.S. 22:658[2] because in their amended petition, plaintiff only sought damages under this statute.
In Reed v. Recard, 97-2250 (La.App. 1st Cir.11/18/98), ___ So.2d ___, 1998 WL 799692, the trial court awarded attorneys' fees to a plaintiff who sought damages under R.S. 22:1220. While noting attorneys' fees are not authorized under R.S. 22:1220, the First Circuit held that although plaintiff had not cited R.S. 22:658 (which does authorize the imposition of attorney fees) in her petition, she alleged facts which if proved would render the insurer liable for attorneys' fees. In her amended petition Ms. Gilpin alleged GEICO was in bad faith in handling her claim and alleged she was entitled to damages, penalties, and attorney's fees under R.S. 22:658, and "any such other as may be applicable." We find these allegations are sufficient to allow the trial court to award penalties pursuant to R.S. 22:1220.
GEICO further argues the trial court erred in awarding penalties under 22:1220, pointing out that this statute does *929 not provide for the automatic imposition of penalties or damages for the breach of "good faith." Rather, GEICO contends, the insurer is liable for damages which the insured may sustain as a result of the breach. GEICO also argues that any penalties which may be authorized are limited to 10 % of damages on the amount found to be due from the insurer pursuant to R.S. 22:658. The plaintiff, on the other hand, argues she is entitled to damages under both statutes.
Statutes 22:658 and 22:1220 are similar in that each provides for penalty awards when an insurer has acted arbitrary, capriciously or without probable cause in failing to timely settle a claim. One primary difference between the two statutes is that under 22:658 penalties are automatic once the finding of arbitrary and capricious is made, while under 22:1220 penalties are discretionary. This interpretation is based on the language of 22:658 which states that when the insurer is found to be arbitrary and capricious, the insurer shall be subject to penalties, and attorney fees. On the other hand, 22:1220 states the claimant may be awarded penalties in the event the insurer is found to have acted arbitrary and capricious.
In the case before us, once the jury determined GEICO acted arbitrary and capricious, GEICO was subject to penalties of 10% of the "amount found to be due from the insurer to the insured," as stated in R.S. 22:658. We find the trial court erred in not awarding penalties pursuant to R.S.22:658, and amend the award to include penalties in the amount of $10,000.00, which is 10% of the amount due plaintiff, (the insured), from GEICO, (the insurer). The uninsured motorist policy had a $100,000.00 limit so $10,000.00 is the maximum penalty which could be imposed under R.S. 22:658.
We also find the plaintiff is entitled to penalties under R.S. 22:1220. See Haas v. Audubon Indemnity Co., 98-565 (La.App. 3rd Cir.10/21/98), 722 So.2d 1022. GEICO urges this court to follow the First Circuit line of cases which hold that the insured must prove damages caused as a result of the insurer's breach in order to recover damages under R.S. 22:1220. See Carter v. Davis, 95-2198 (La.App. 1st Cir.5/10/96), 673 So.2d 362. GEICO contends the record is void of evidence related to damages as a result of their alleged breach of good faith. In the alternative, GEICO contends that in the absence of proof of damages caused by the insurer's breach of good faith, penalties are limited to $5,000.00. See Brinston v. Automotive Casualty Insurance Co., 96-1982 (La. App 4th Cir. 12/3/97), 703 So.2d 813 and Hall v. State Farm Mutual Automobile Insurance Co., 94-867 (La.App. 3rd Cir.5/31/95), 658 So.2d 204.
In Genusa v. Robert, 98-449 (La. App. 5th Cir.10/14/98), 720 So.2d 166, this Court found the insurer violated R.S. 22:1220 and without discussing damages, awarded the insureds $5,000.00 each. Hence, we hold that in the absence of proof of damages pursuant to a breach of the good faith duty imposed on the insurer under R.S. 22:1220, the amount of penalties is limited to $5,000.00. Accordingly, the penalty awarded to Ms. Gilpin by the trial court pursuant to R.S. 22:1220 is reduced to $5,000.00.
We hold that the total maximum penalty award, when there is no proof of damages caused by the breach of the insurer's duty to settle claims in good faith under R.S. 22:1220, is $5,000.00. The maximum penalty award for the insurer's failure to timely pay a claim pursuant to the guidelines under R.S. 22:658, is limited to 10% of the insurer's obligation to the insured, or $1,000.00, whichever is greater. In the case before us, the amount of combined penalties which can be awarded under both statutes is $15,000.00. Hence, we have reduced the penalties awarded by the trial court from $40,500.00 to $15,000.00.
GEICO correctly argues that the trial court was without authority to award attorneys' fees under R.S. 22:1220. This *930 statute does not provide for the imposition of attorneys' fees; attorneys' fees are not allowed in Louisiana except where authorized by statute or contract. We find however that the plaintiff is entitled to attorneys' fees pursuant to R.S. 22:658. Accordingly, we affirm the trial court's award of attorneys' fees. Appellant has not raised as error the amount of attorneys' fees awarded, therefore, we do not address that issue.
For the foregoing reasons, the judgment of the trial court awarding $75,000.00 for physical impairment is affirmed. The trial court's award of past medical expenses is decreased to $10,631.74, and the award of future medical expenses is decreased to $40,000.00. The trial court's finding that GEICO was arbitrary and capricious is affirmed and the penalties awarded by the trial court are amended to decrease the award of penalties to $15,000.00.
AFFIRMED AS AMENDED.
NOTES
[1] R.S. 22:1220 reads in pertinent part:

A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
. . . . .
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.
[2] R.S. 22:658 provides in pertinent part:

B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater ... and all reasonable attorney fees for the prosecution and collection of such amount.