74 So.3d 1159 (2011)
Ginger Hinch DURIO
v.
HORACE MANN INSURANCE COMPANY, et al.
No. 2011-C-0084.
Supreme Court of Louisiana.
October 25, 2011.
*1160 Milling Benson Woodward, LLP, New Orleans, Michael E. Holoway, for Applicant.
Joseph Anthony Delafield, Lundy, Lundy, Soileau & South, Jackey White South, Rudie Ray Soileau, Jr., Hunter William Lundy, Lake Charles, The Barret Law Firm, Winfred Thomas Barrett, III, for Respondent.
JOHNSON, Justice.
This writ application arises from Plaintiff's claims for property damage to her home following Hurricane Rita and for damages and penalties against her homeowner's insurer pursuant to La. R.S. 22:658 and La. R.S. 22:1220.[1] We granted *1161 the writ application primarily to review the correctness of the rulings of the lower courts applying the penalty provision of La. R.S. 22:1220(C) to contractual damages, and awarding attorney fees pursuant to the amended version of La. R.S. 22:658. For the reasons that follow, we affirm in part, reverse in part and amend in part.

FACTS AND PROCEDURAL HISTORY
In September of 2005, Plaintiff, Ginger Hinch Durio ("Ms. Durio"), owned and lived with her three children in a home on East Banbury Drive in Lake Charles, Louisiana. Plaintiff's home was covered by a homeowner's insurance policy issued by defendant, Horace Mann Insurance Company ("Horace Mann"). The policy provided the following coverage limits: Coverage A (Structure/Dwelling)$173,300.00; Coverage B (Other Detached Structures) $17,330.00; Coverage C (Contents) $103,980.00; and Coverage D (Additional Living Expenses)$103,980.00.
On September 24, 2005, Plaintiff's home was damaged by Hurricane Rita. The home had an attached garage, and the majority of the damage occurred when winds dislodged the garage door, causing the main support beam to collapse, resulting in a partial collapse of the garage structure. The extent of damage to the rest of the structure and to the interior of the home was disputed, other than water damage caused when a hot water heater in the attic overturned. Ms. Durio was in the process of a divorce at the time of the hurricane, and obtained ownership of the home through the community property settlement. Due to financial difficulties, she had recently signed a contract to sell the home. In anticipation of their move, the Durios had packed up many of their belongings and stored them in the garage. When the ceiling inside the garage collapsed, their stored belongings were destroyed.
Ms. Durio filed suit against Horace Mann on June 13, 2006. In her Petition for Damages, she alleged the "dwelling, contents and appurtenant structures [shed] were completely destroyed by Hurricane Rita," but Horace Mann "consistently arbitrarily and capriciously refused to classify [the] home as a total loss." Ms. Durio asserted bad faith claims under La. R.S. 22:658 and La. R.S. 22:1220. At trial, conflicting evidence was presented regarding the extent of damage to the property. In addition, expert testimony was presented regarding Ms. Durio's claims for emotional distress damages and lost wages as a result of Horace Mann's bad faith adjustment of her claim. The relevant evidence in the record is generally summarized below.
Plaintiff initiated a claim with Horace Mann on September 27, 2005. On October 1, 2005, Horace Mann issued a $2,500.00 check to Ms. Durio as an advance on additional living expenses ("ALE"). Ricky Fine, an independent claims adjuster hired by Horace Mann, testified he did a full inspection of the property on October 12, 2005. He noted the garage was severely damaged, and noted some interior damage from the hot water heater. His estimate also allowed for an electrical inspection of the garage and home to assess the amount of damage caused by the garage collapsing. Mr. Fine testified there was no storm related damage to the slab, and he did not believe the house needed to be rebuilt. He opined the structural damage was limited to the garage. The Horace Mann adjuster's reports dated November 2, 2005, reflect estimated damages of $19,293.70 under Coverage A and $8,217.03 under coverage B. On November 4, 2005, Horace Mann issued a check for damage to the dwelling (Coverage A) in the amount of *1162 $18,293.70 (estimate less deductible), and a check for damage to other structures (Coverage B) in the amount of $8,217.03. These checks were never negotiated. The record reflects that Ms. Durio did not negotiate the checks because her ex-husband was also listed as a payee on the checks (the Horace Mann policy was issued in both names), and there was no indication on the checks that the payments were intended as an unconditional tender.
Ms. Durio was dissatisfied with the estimate of damages, and insisted the home was a total loss. At the request of Ms. Durio, Horace Mann reinspected the property on November 18, 2005. On December 5, 2005, Horace Mann issued a supplemental payment for structural damage (Coverage A) in the amount of $1,572.27, and a check in the amount of $6.99 for contents (Coverage C). Horace Mann subsequently issued additional checks for ALE, each in the amount of $1,950.00, on October 1, 2005, November 1, 2005, December 1, 2005, and January 1, 2006, for a total of $7,800.00. No further payments were made by Horace Mann under Coverages A, B or D.
Because she still disagreed with Horace Mann's estimation of the extent of damages, Ms. Durio hired an engineer to inspect the property. Mr. Charles Norman, P.E., inspected the house on January 21, 2006, and issued a report dated January 26, 2006, in which he opined the house was not livable, and the structural and mechanical integrity of the home was compromised. Specifically, his report provides:
 The upper attic frame is compromised and very unstable. Portions have failed and collapsed from storm related damages.
 The home has distorted in both lateral directions and permanently shifted. The upper frame structure will require significant repair and mitigation before the home is livable.
 The ventilation system was severely compromised due to electrical and water problems related to the storm. Ventilation is a major issue inside the home due to mold and moisture. In my opinion, the home is unsafe to live in.
 There are significant issues with electrical wiring and connections throughout the home. Therefore fire safety is an issue.
 There is a significant loss of mechanical and structural integrity in the home due to hurricane winds. In other words, major repairs will be required to restore the home to a livable condition.
On March 25, 2006, Mr. Norman issued a supplemental report based on his January 21, 2006, inspection. His opinion of the damage remained the same, however he also stated that a comprehensive repair plan should be developed for the home which should be weighed against a complete rebuilding. He made an additional recommendation that at least fifty percent of the entire attic frame should be replaced, with the section over the garage and north of the garage rebuilt from the slab upward. He also stated the slab should be evaluated for movement.
On April 28, 2006, Ms. Durio submitted a "Sworn Proof of Loss," through her attorney, which was received by Horace Mann on May 5, 2006. In the Proof of Loss, Ms. Durio stated, among other things, that the home was totally destroyed along with all contents, and the damages exceeded the value of coverage provided by the insurance policy. Included with the Proof of Loss were the engineering reports from Mr. Norman; an appraisal of the home dated October 8, 2004; Ms. Durio's compilation of damaged contents *1163 and their values; and photographs of the damage.
Horace Mann hired its own engineer to evaluate the damage to the house. On May 15, 2006, Rimkus Consulting Group issued an engineering report on behalf of Horace Mann. While noting the structural integrity of the attached garage was compromised by wind forces, and acknowledging problems caused by the partial collapse of the garage structure, the report stated repairs could be made to the structures without requiring demolition of the residence. On August 7, 2006, Rimkus issued a supplemental report outlining in more detail the work to be performed as part of the repairs to the residence. On August 16, 2006, Rimkus issued a repair work plan based on its reports of May 15, 2006, and August 7, 2006.
Craig Rogers an expert in civil engineering and forensic engineering, was employed by Rimkus, and inspected the house on November 29, 2006. He testified there was structural damage to the property, and agreed the house presented a safety hazard and was still uninhabitable at the time of his inspection. However, he disagreed with any opinion that there was damage to the slab of the house as a result of the storm. Mr. Rogers performed tests on the slab, as recommended by Mr. Norman, which showed nothing out of the ordinary. Any cracks in the slab were the result of normal shrinkage and were unrelated to the storm. Mr. Rogers opined there was no evidence of any permanent structural deficiencies in the house beyond the garage. In his expert opinion, the house did not need to be demolished, and the Rimkus repair plan would aid whoever repaired the house.
Ms. Durio proceeded to obtain estimates to repair the home pursuant to Mr. Norman's reports. In May of 2006, Bayou General Contractors prepared an estimate to replace the home totaling $299,200.00. Paul Young of Bayou General Contractors testified there was structural damage to the home, and testified he also took Mr. Norman's report into consideration when preparing his cost estimate.
On October 4, 2006, Horace Mann reissued checks for Coverages A and B in the amounts of $19,872.96 and $8,217.03. The original checks had been voided by Horace Mann because they were never negotiated. On that same date, Horace Mann issued a check for the full value of the contents (Coverage C) in the amount of $47,061.44.
Ms. Durio obtained a second repair estimate in November of 2006 in the amount of $46,656.00 from Lewing Construction. Ralph Lewing testified the biggest part of damage was to the garage, where the beam collapsed and joists caved in. He noted other minor damage to the exterior and interior of the home. He did not believe the house was a total loss. He found no unusual or storm related damage to the slab.
On January 8, 2007, Rimkus issued another supplemental report after Mr. Rogers' inspection of the property on November 29, 2006. This report indicated several instances of defects in the original construction of the house, which Rimkus found to be causes of the partial collapse of the garage structure.
Ms. Durio subsequently hired Mr. Kermith Sonnier at Cost Control Services as a consultant/public adjuster to inspect that house and provide an adjustment of total losses. Mr. Sonnier's initial report dated August 16, 2007, showed total losses as follows: $57,776.30 for the dwelling; $16,578.93 for other structures; $45,180.00 for contents; and $10,950.00 for ALE. Mr. Sonnier was accepted by the court as an expert in property adjusting. He testified this initial report was preliminary, and he *1164 did not inspect the entire house. After receiving a copy of Mr. Norman's engineering report, and reinspecting the house, he issued a supplemental report on February 21, 2008, updating his August 16, 2007, estimate of costs at the request of Ms. Durio's attorney. Based on Mr. Norman's 2006 report, he estimated losses of: $188,268.73 for the dwelling (Coverage A); $16,578.93 for other structures (Coverage B); $45,180.00 for contents (Coverage C); and $10,950.00 for ALE. Mr. Sonnier noted Mr. Norman's January 26, 2006, report suggested the integrity of the dwelling was compromised, and based on this report, the dwelling was total loss per the policy limits.
In September of 2007, Ms. Durio sold the home to its original contractor, Joe Seago. Mr. Seago testified he encountered Ms. Durio sometime in late 2005, and she asked him to inspect the damages to the home. He testified the house could be repaired for $35,000.00 to $40,000.00. While he agreed there was structural damage, he found no problem with the slab. He purchased the house for $132,500.00, with a plan to repair it and sell it for a profit. He spent $34,681.97 to repair the house to its pre-storm condition. However, this amount did not include adjustments for overhead or profit, or account for Mr. Seago's labor costs.
Following a bench trial, the court ruled in favor of Ms. Durio. In oral reasons for judgment, the court ordered payment of policy limits on Coverage A, specifically noting he gave greater credence to Ms. Durio's expert. The court believed Mr. Norman's evaluation of the structural damage to the house, and based on damage estimates submitted at trial, the court found the house to be a constructive total loss. The court noted the inflationary rider in the policy, adding an additional $10,109.00 of coverage, making the policy value $183,409.00. Subtracting the amount Horace Mann previously paid, the court awarded Coverage A losses of $163,536.97.
The court also awarded penalties relative to Coverage A. The court found formal notice of the losses was mailed on April 28, 2006, and received in Horace Mann's home office on May 5, 2006. Thus, satisfactory proof of loss was made as of May 5, 2006. The court found it significant that Horace Mann failed to make any additional tenders, even though Horace Mann relied on cost estimates at trial which all exceeded the amounts its adjusters initially proposed. The trial court also stated: "It basically appears that this file was mismanaged. There is missing correspondence. There are missing photographs, unexplained handwritten notes, additional bureaucratic delays with third-party delays with third-party dealings, apparently a rotating door of adjusters all contributed to Horace Mann's failure to properly adjust this claim." Thus, the court found Horace Mann was arbitrary and capricious, and failed to deal with Ms. Durio fairly or in good faith, and awarded penalties under La. R.S. 22:658 and La. R.S. 22:1220.
The court also gave more weight to the estimates of damages under Coverage B provided by Mr. Sonnier, rather than that provided by Horace Mann's adjuster, Mr. Fine. The court found Coverage B damages totaled $16,578.98, and subtracting the $8,217.03 already paid by Horace Mann, the court awarded $8,361.91. While the court noted Mr. Sonnier's particular estimate was provided to Horace Mann on February 21, 2008, during the course of litigation, it also noted the full extent of the loss was provided in the original proof of claim on May 5, 2006. Thus, the trial court awarded penalties under both La. R.S. 22:658 and La. R.S. 22:1220.
*1165 The trial court noted there was no dispute of quantum under Coverage C. The court found that proof of loss for contents was provided on May 5, 2006, but no payments were made until October 4, 2006. Thus, the court found violations of La. R.S. 22:658 and La. R.S. 22:1220 and awarded penalties under both statutes.
As to Coverage D, the trial court noted Ms. Durio was only paid for four months of ALE, but Horace Mann's file indicated she was being paid or should be paid for a period of up to six months. The court found it was established that there were health and safety issues making the house unlivable. Further, testimony demonstrated it would be a minimum of six months to a year before the property could be repaired. By its own computations, Horace Mann determined $1,950.00 per month was an appropriate ALE based on the four-month average. The court found ALE losses continued until September of 2007, when Ms. Durio sold the house, and thus awarded an additional twenty months ALE at $1,950.00 per month for a total of $39,000.00. The court did not find there was satisfactory proof of loss under La. R.S. 22:658, so no penalties were awarded under that statute. However, the court found Horace Mann was not in good faith and did not fairly deal with Ms. Durio pursuant to La. R.S. 22:1220. The trial court noted that post-January of 2006, Ms. Durio's stress and anxiety level clearly increased, demonstrated by expert medical testimony, and continued as the claim proceeded without resolution. The court applied La. R.S. 22:1220 penalties of double the award for ALE, totaling an additional $78,000.00.
The trial court also awarded general and special damages as a result of Horace Mann's breach of its duties under La. R.S. 22:1220. The trial court found Ms. Durio proved her claim for mental distress damages with medical expert testimony. The court awarded $3,000.00/month for thirty-eight months for a total of $114,000.00. However, the court also found the claims process was only fifty percent responsible for her stress, and thus reduced that amount to $57,000.00. The trial court added penalties under La. R.S. 22:1220 of double the amount of mental distress damages. Regarding lost wages, Ms. Durio was employed as a master teacher for Calcasieu Parish, and was participating in the Teacher Advancement Program ("TAP"). The TAP system is a comprehensive strategy to boost teacher effectiveness through opportunities for career advancement, professional growth, performance evaluations, and competitive compensation. The court noted the record, including testimony by Plaintiff's economist, Dr. Bettinger, showed Ms. Durio had to withdraw from the TAP program due to stress and being overwhelmed. The program provided her with an additional $7,000.00/year in income. The court found lost wages of $17,309.00 were established more probable than not. The Court did not find any future loss of wages because the program was only a three-year program. The court did find it more probable than not that Ms. Durio lost future retirement benefits based on the higher wages for three years, and awarded $93,024.00 based on Dr. Bettinger's calculations. Thus, the trial court awarded total losses of $110,333.00. The court doubled these damages to add penalties pursuant to La. R.S. 22:1220.
Relying on its finding that sufficient proof of loss was received by Horace Mann on May 5, 2006, the trial court declined to apply the amended version of La. R.S. 22:658, which went into effect on August 15, 2006. Thus, the court awarded penalties of twenty-five percent under the pre-amendment *1166 version of the statute, and declined to award attorney fees.[2]
Horace Mann filed a motion for new trial, which was opposed by Ms. Durio. In her opposition, Ms. Durio noted the trial court awarded penalties pursuant to both La. R.S. 22:658 and La. R.S. 22:1220, and acknowledged this was legal error. Additionally, Ms. Durio argued she was entitled to an award of attorney fees under the amended version of La. R.S. 22:658. At the hearing on the motion for new trial, the court found it erred in awarding penalties under both La. R.S. 22:658 and La. R.S. 22:1220, and thus it vacated its awards under La. R.S. 22:658. Otherwise, the court denied Horace Mann's motion for new trial. Apparently on its own motion, the court also granted a new trial relative to the attorney fees issue. Noting that newly discovered damages can trigger the amended version of La. R.S. 22:658, the court found there was newly discovered damages as established by the proofs of claim submitted, and those newly discovered damages were subsequent to the amendment. Therefore, the court assessed and awarded fees of one-third of the total award (as adjusted by the removal of La. R.S. 22:658 penalties), totaling $379,905.84.
Thus, final judgment was entered as follows:
CONTRACTUAL DAMAGES L
Coverage A (loss of residence):
$163,536.97 plus 22:1220 penalties of $327,073.94
Coverage B (other structures):
$8,361.91 plus 22:1220 penalties of $16,722.90
Coverage C (contents):
$0 plus 22:1220 penalties of $5,000.00
Coverage D (living expenses):
$39,000.00 plus 22:1220 penalties of $78,000.00
Total contractual damages $210,898.88
Total penalties $426,796.84
GENERAL AND SPECIAL DAMAGES L
Mental anguish $57,000.00 plus 22:1220 penalties of $114,000.00
Lost wages $17,309.00 plus 22:1220 penalties of $34,618.00
Retirement losses $93,024.00 plus 22:1220 penalties of $186,048.00
Total general and special damages $167,333.00
Total penalties $334,666.00
ATTORNEY FEE

 One-third contingency fee $ 379,905.84
 TOTALS
 Contractual damages $ 210,898.88
 Contractual penalties $ 426,796.84
 General/special damages $ 167,333.00
 General/special penalties $ 334,666.00
 Attorney fee $ 379,905.84
 TOTAL AWARD $1,519,600.56

Horace Mann appealed the judgment in its entirety, and Ms. Durio appealed the award of general damages. The court of appeal affirmed.[3]
The court of appeal found no error in the trial court's award of damages under the insurance contract. The court primarily noted the varying reports of damage sustained by the house, and found the trial court evaluated the evidence and made credibility determinations in finding Ms. Durio's evidence more credible.
*1167 The court also affirmed the award of general damages of $57,000.00 for Ms. Durio's mental anguish. The court found the actions of Horace Mann to be intentional, in bad faith, and designed to discourage the insured from pursuing her claims. The court noted the trial court's finding:
[Horace Mann's conduct was] egregious and included such actions as assigning over eight different adjustors to this claim, facetiously sending Ms. Durio a lone check for $6.99 for loss of contents after noticing a broken flower pot, and relying on the report of an engineer who inspected the house through the photographs and notes of an adjustor. Only when Horace Mann initiated a subrogation action against the builder of the house did the engineer actually visit the premises.
The court reasoned Ms. Durio suffered from anxiety to an extent that she had to take medication, adjust her employment, and seek medical care for a variety of stress-related symptoms.
The court also affirmed the award of $17,309.00 in lost wages and $93,024.00 in lost future retirement benefits for the period of time Ms. Durio was unable to work due to stress-related symptoms caused by the actions of Horace Mann.
The court further found no error in the trial court's award of penalties. The trial court found satisfactory proof of loss was received in May of 2006. Not only did Ms. Durio send documentation of additional structural damage, but even Horace Mann's adjustors notified the company that Ms. Durio's losses exceeded the $19,872.96 payment made in November of 2005. The trial court characterized Horace Mann as having "acted in a dilatory and non-customer service fashion in adjusting or resolving" this claim. The court noted the record supported the factual finding of the trial court that the handling of Ms. Durio's claim was arbitrary and capricious. Even with adequate information on the increased repair estimates from its own adjustors, Horace Mann refused to tender the undisputed amount of the claim. As to the calculation of penalties, the court cited other cases where courts have awarded La. R.S. 22:1220(C) penalties based on contractual damages.[4] Thus, it found no error in the penalties awarded by the trial court.
The court further affirmed the award of attorney fees under La. R.S. 22:658. The court disagreed with Horace Mann's argument that the statute authorizing such an award was not in effect at the time Ms. Durio's proof of claim was received by Horace Mann, and thus could not be applied retroactively. The court noted Horace Mann had a continuing duty of good faith and fair dealing which extended throughout the litigation period. The trial court found Ms. Durio's final proof of loss was received by Horace Mann in 2008, long after the amendment providing for attorney fees became effective. Therefore, the 2006 amendment applied. The court found no error in this conclusion.
Horace Mann filed the instant writ application with this court, which we granted.[5]

DISCUSSION
Horace Mann raises several assignments of error. After full review of the record *1168 and law, we find merit in two. Thus, we will address whether the lower courts erred in the calculation of penalties under La. R.S. 22:1220, and whether the lower courts erred in awarding attorneys fees pursuant to La. R.S. 22:658, as amended on August 15, 2006.[6]

Calculation of Penalties under La. R.S. 22:1220
This issue is a question of law involving the correct interpretation of Section (C) of La. R.S. 22:1220. Thus, we review the matter de novo, and render judgment on the record, without deference to the legal conclusions of the courts below. This court is the ultimate arbiter of the meaning of the laws of this state. Red Stick Studio Development, L.L.C. v. State of Louisiana by and Through the Department of Economic Development, 2010-0193 (La.1/19/11), 56 So.3d 181, 187; Cleco Evangeline, LLC v. Louisiana Tax Commission, 2001-2162 (La.4/3/02), 813 So.2d 351, 355.
La. R.S. 22:1220 provides, in pertinent part:
A. An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.
(Emphasis added)
Horace Mann argues the trial court erred in calculating La. R.S. 22:1220 penalties by doubling contractual amounts due under the insurance contract, rather than calculating the penalties based solely on the consequential damages sustained as a result of a breach of duties under La. R.S. 22:1220. Ms. Durio argues Horace Mann's position improperly restricts La. R.S. 22:1220, and application of statutory penalties to all amounts due, including contractual damages as well as consequential damages, is consistent with the intent, purpose and policy underlying La. R.S. 22:1220.
This Court provided a detailed summary of guidelines for statutory interpretation in Sultana Corp. v. Jewelers Mutual Ins. Co., 2003-0360 (La.12/3/03), 860 So.2d 1112:
The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. Principles of judicial interpretation of statutes are designed to ascertain and enforce the intent of the Legislature in enacting the statute. The fundamental question in all cases of statutory construction is legislative intent and the reasons that prompted the Legislature to enact the law. When a law is clear and unambiguous and its application does not lead to absurd consequences, *1169 it shall be applied as written, with no further inquiry made in search of the legislative intent. The meaning and intent of a law is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it. The statute must therefore be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the Legislature had in enacting it. Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided. Furthermore, the object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result. The starting point in the interpretation of any statute is the language of the statute itself. (Internal citations removed).
Sultana, 860 So.2d at 1115-16. Examining La. R.S. 22:1220 in light of these guidelines, we agree with Horace Mann that the lower courts' application of the statute was erroneous.
While this issue is res nova in this Court, we note that since its enactment in 1990, it appears Louisiana circuit courts consistently applied La. R.S. 22:1220(C) by calculating penalties based solely on consequential damages, or awarding $5,000.00 if no such damages were proven.[7] However, this recently changed in Neal Auction Co. v. Lafayette Ins. Co., 2008-0574 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135, 1147, when a panel of the Fourth Circuit awarded a penalty of double the total damages (including damages due under the insurance contract) pursuant to La. R.S. 22:1220. Relying on Neal Auction, the Fourth Circuit again doubled contractual damages in awarding La. R.S. 22:1220 penalties in Wegener v. Lafayette Ins. Co., 2009-0072 (La.App. 4 Cir. 3/10/10), 34 So.3d 932, judgment vacated, 2010-0810 (La.3/15/11) 60 So.3d 1220,[8] and Buffman, Inc. v. Lafayette Ins. Co., 2009-0870 (La.App. 4 Cir. 4/14/10), 36 So.3d 1004.[9] In line with these Fourth Circuit opinions, the Third Circuit in this case affirmed an award of La. R.S. 22:1220 penalties calculated by doubling all damages awarded, including contractual damages. Interestingly, different panels of the Fourth Circuit reached opposite conclusions in Audubon Orthopedic and Sports Medicine, APMC v. Lafayette Ins. Co., 2009-0007 (La.App. 4 Cir. 4/21/10), 38 So.3d 963, writ denied, 2010-1153 (La.10/8/10), 46 So.3d 1266, and Ferrara, *1170 Inc. v. Lafayette Ins. Co., 2009-1681 (La.App. 4 Cir. 8/4/10), 41 So.3d 663 (unpub.), writ denied, 2010-2021 (La.11/12/10), 49 So.3d 889.
La. R.S. 22:1220 legislatively imposes a duty of good faith and fair dealing on insurers, and sets forth certain acts, which if knowingly committed by an insurer, constitutes a breach of that duty. Wegener, 60 So.3d at 1229. Section (A) provides for the mandatory award of any "damages sustained as a result of the breach" of the duty imposed. Section (C) provides that in addition to these damages, discretionary penalties can be awarded, limited to two times the "damages sustained," or $5,000.00, whichever is greater. Considering the statute in its entirety and applying the words of the statute as written, the only logical reading is that the "damages sustained" in Section (C) are the same "damages sustained as a result of the breach" in Section (A).
A comparison of the wording of La. R.S. 22:1220 with La. R.S. 22:658 also supports our holding. Before La. R.S. 22:1220 was enacted in 1990, La. R.S. 22:658 already existed as a penalty provision in the Insurance Code. La. R.S. 22:658 provides that an insured is entitled to penalties if the insurer fails to pay a claim within thirty days after satisfactory proof of loss, and that failure is found to be arbitrary, capricious, or without probable cause. The statute subjects "the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured." La. R.S. 22:658(B)(1).[10] Comparing the wording of La. R.S. 22:1220 to La. R.S. 22:658, it is clear that while La. R.S. 22:658 penalties are calculated based on amounts due under the insurance contract, penalties under La. R.S. 22:1220 are not. The wording of La. R.S. 22:658 specifically provides that the penalty is calculated based on "the amount found to be due from the insurer to the insured" in addition to the amount of the loss. Had the legislature intended that La. R.S. 22:1220 penalties be calculated based on the amount due under the contract, it would have easily and clearly stated so in the statute, as it did in La. R.S. 22:658.
Further, as this Court recently noted, La. R.S. 22:1220 specifically refers to a breach of the duty of good faith and fair dealing, not a breach of the insurance contract. Wegener, 60 So.3d at 1230. The duties of an insurer under La. R.S. 22:1220 are separate and distinct from its duties under the insurance contract. Id. at 1229. Thus, a claim against an insurer for breach of the insurance contract and a claim against an insurer for breach of its duty of good faith and fair dealing under La. R.S. 22:1220 are two separate causes of action. Because it is a violation of the statute, not a breach of the insurance contract, which triggers the penalty provision, it would be inconsistent to hold that contractual amounts due pursuant to the terms of the contract should be included as "damages sustained" under La. R.S. 22:1220.
Thus, following proper guidelines of statutory interpretation, and being mindful that statutes subjecting insurers to penalties are considered penal in nature and should be strictly construed,[11] we reverse the holdings of the lower courts, and find that La. R.S. 22:1220 penalties are determined with reference to La. R.S. 22:1220 *1171 damages only. A logical and consistent reading of the statute mandates a finding that contractual damages due or awarded under the insurance contract should not be used to calculate penalties under the statute. Rather, penalties are calculated by doubling the amount of damages attributable to the insurer's breach of duties imposed under the statute.
In this case, Ms. Durio was awarded damages of $167,333.00 as a result of Horace Mann's breach of its duties under La. R.S. 22:1220. Penalties are calculated by doubling this amount, for a total of $334,666.00. Thus, the trial court's judgment is amended to reflect total penalties in this amount.[12]

Application of the Amended Version of La. R.S. 22:658
We next consider whether Ms. Durio is entitled to attorney fees pursuant to La. R.S. 22:658, as amended in 2006. At the time Ms. Durio's property was damaged by Hurricane Rita, as well as when Horace Mann began adjustment of her claim, La. R.S. 22:658(B) provided for the imposition of a twenty-five percent penalty against insurers who, in bad faith, failed to make payment within thirty days of receiving satisfactory written proof of loss. There was no provision permitting the award of attorney fees.[13] However, effective August 15, 2006, the Legislature amended La. R.S. 22:658(B) to provide for a fifty percent, rather than a twenty-five percent penalty, and to allow for the imposition of reasonable attorney fees and costs. Acts 2006, No. 813, § 1.[14]
Horace Mann argues this Court previously determined in Sher v. Lafayette Ins. Co., 2007-2441 (La.4/8/08), 988 So.2d 186, that the amended version of La. R.S. 22:658 could not be applied retroactively, and that the cause of action arises once satisfactory proof of loss is made to the insurer. Here, the trial court found Ms. Durio submitted adequate proof of loss in April of 2006long before the amended statute took effect on August 15, 2006. Further, there was no evidence of new damage discovered subsequent to the effective *1172 date of the statute which would allow for application of the post-amendment version of the statute.
By contrast, Ms. Durio argues the trial court's decision to apply the amended version of La. R.S. 22:658 was proper under this Court's decision in Sher. Ms. Durio asserts there was conduct by Horace Mann that occurred after the August 15, 2006, effective date of the amendment which violates the statute. Specifically, because Horace Mann independently elected to conduct a reinspection of the home after August 15, 2006, it was required to adjust the property and act in accordance with the version of La. R.S. 22:658 in effect at that time.
Our decision in Sher made clear that the 2006 amendments to La. R.S. 22:658 are not retroactive. 988 So.2d at 199. This Court found an insurer's failure to pay is not a continuing obligation that exposes it to liability pursuant to the amended version of La. R.S. 22:658; rather, we held that, as a general rule, the cause of action and, therefore, an insured's right to recover, comes into existence when and if the insurer fails to pay thirty days after receiving satisfactory proof of loss. Id. However, while this Court held the amendments were not retroactive, we also recognized two situations which might allow for the application of the post-amendment version of La. R.S. 22:658: if the plaintiff had not made satisfactory proof of loss prior to the amendment of La. R.S. 22:658, a petition for damages served after the amendment became effective could serve as satisfactory proof, and therefore trigger the amended version of the statute; or, if the plaintiff discovered new damage and made satisfactory proof of loss which the insurer failed to pay after the amendment became effective, the amended version of the statute could apply. Id.
Based on the record in this case, we find no basis to apply the post-amendment version of La. R.S. 22:658. The evidence in the record reflects that Ms. Durio's cause of action for penalties against her insurer arose prior to the effective date of the amendment, when Horace Mann failed to pay the claim thirty days after satisfactory proof of loss was received on May 5, 2006. Nor do the facts of this case present one of the situations set forth in Sher which may allow application of the amendments. First, Ms. Durio both submitted sufficient proof of loss and filed her petition for damages prior to August 15, 2006. Secondly, there were no new damages discovered subsequent to August 15, 2006.
The record clearly shows that Ms. Durio asserted her house suffered extensive damages resulting in a total loss shortly after she initiated a claim with Horace Mann. Further, Mr. Norman's January and March, 2006, reports detail extensive structural damage to the house, and Ms. Durio's Sworn Proof of Loss submitted in April of 2006 states that the home was totally destroyed. Moreover, Ms. Durio's Petition for Damages filed on June 13, 2006, asserts that the house was completely destroyed by Hurricane Rita, but Horace Mann refused to classify the home as a total loss. Additional information provided to Horace Mann relative to costs to repair and/or replace the house does not equate to new damage, nor does it change the fact that the house was a total loss from the beginning of the claim. Further, we do not find the reinspection of the property initiated by Horace Mann in November of 2006 created a new cause of action.
Based on our decision in Sher, the amended version of La. R.S. 22:658 cannot be applied in this case. Thus, we reverse the lower courts' rulings applying the amended version of the statute, and vacate the award of attorney fees.

*1173 CONCLUSION
For the above reasons, we hold that the lower courts erred in calculating La. R.S. 22:1220 penalties based on contractual amounts due under the insurance contract. Such penalties are properly calculated by doubling the amount of damages sustained as a result of the insurer's breach of its duties under the statute. Applying the proper statutory interpretation to the facts of this case, we amend the trial court's judgment to reflect the correct award of penalties totaling $334,666.00.
We also hold the lower courts erred in applying the amended version of La. R.S. 22:658, thereby allowing attorney fees to be awarded. Thus, we reverse the lower courts' rulings on this issue, and vacate the award of attorney fees.
In all other respects, the rulings of the lower courts are affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.
VICTORY, J., additionally concurs in part.
I concur in the majority opinion but would have addressed the other assignments of error.
KNOLL, Justice, concurring in part and dissenting in part.
Although I concur with the majority opinion's interpretation and application of the penalty provisions contained in La. Rev. Stat. § 22:1220(C), with all due respect, I dissent from the majority's failure to apply the amended version of La.Rev. Stat. § 22:658 to the facts of this case for the reasons expressed in my dissent in Sher v. Lafayette Ins. Co., 07-2441 (La.4/8/08), 988 So.2d 186, 208-09. As I explained therein, the majority's limited application of the amendment to the filing of a satisfactory proof of loss, rather than based upon the conduct of the insurer, is fundamentally flawed. In my view, such an application both "frustrates and fails to recognize the Legislature's strong public policy efforts to discourage the arbitrary and capricious conduct of the insurer in dealing fairly and in good faith with the insured." Id. Moreover, because the insurer's obligation is a continuing obligation, the application of the amendment is not and should not be limited to the time frame set forth in the statute. Therefore, I would apply the statute as amended and affirm the award of attorney's fees.
NOTES
[1] These statutes were renumbered pursuant to La. Acts 2008, No. 413 to La. R.S. 22:1892 and La. R.S. 22:1973, respectively. For clarity, we refer to the previous statute numbers in this opinion.
[2] La. R.S. 22:658 was amended as of August 15, 2006, to allow for an award of attorney fees, and to increase penalties from twenty-five to fifty percent.
[3] Durio v. Horace Mann Ins. Co., 2010-698 (La.App. 3 Cir. 12/8/10) (unpub).
[4] The court of appeal cited Morrell v. Fisher, 08-1260 (La.App. 3 Cir. 4/1/09), 7 So.3d 1264; Wegener v. Lafayette Ins. Co., 09-72 (La.App. 4 Cir. 3/10/10), 34 So.3d 932; Neal Auction Co., Inc. v. Lafayette Ins. Co., 08-0574 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135, writs denied, 09-1499, 09-1608 (La.11/6/09), 21 So.3d 313.
[5] Durio v. Horace Mann Ins. Co., 2011-0084 (La.7/1/11), 64 So.3d 234.
[6] We decline to address the other assignments of error raised by Horace Mann.
[7] See, e.g., Harris v. Fontenot, 606 So.2d 72 (La.App. 3 Cir. 1992); Midland Risk Ins. Co. v. State Farm Mut. Auto. Ins. Co., 93-1611 (La. App. 3 Cir. 9/21/94), 643 So.2d 242; Hall v. State Farm Mut. Auto. Ins. Co., 94-867 (La. App. 3 Cir. 5/31/95), 658 So.2d 204; Gilpin v. State Farm Mut. Auto. Ins. Co., 99-36 (La. App. 5 Cir. 5/19/99), 735 So.2d 921; Hollier v. State Farm Mut. Auto. Ins. Co., 2001-0592 (La.App. 3 Cir. 10/31/01), 799 So.2d 793; Urrate v. Argonaut Great Central Ins., 04-256 (La.App. 5 Cir. 8/31/04), 881 So.2d 787; Lewis v. State Farm Ins. Co., 41,527 (La.App. 2 Cir. 12/27/06), 946 So.2d 708.
[8] This Court granted writs in Wegener to resolve the issue of calculation of penalties under La. R.S. 22:1220. However, finding other errors, this Court vacated the judgment and remanded for new trial without reaching that issue.
[9] In Buffman, Lafayette Insurance Company has filed a writ application in this Court challenging the Fourth Circuit's ruling on this issue.
[10] Prior to its amendment on August 15, 2006, the statute provided for a twenty-five percent penalty.
[11] Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184, 186.
[12] We have determined that penalties under La. R.S. 22:1220 are greater than those that would be awarded under La. R.S. 22:658. See Calogero v. Safeway Ins. Co., 1999-1625 (La. 1/19/00), 753 So.2d 170, 174.
[13] The statute provided, in pertinent part: B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim . . . when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
[14] The amended statute provides, in pertinent part: B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim . . . when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. (Emphasis added)