STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-475

CLARENCE M. LELAND, ET UX.

VERSUS

LAFAYETTE INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-5513
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy and
Phyllis M. Keaty, Judges.

AFFIRMED AS AMENDED.

Donald C. Brown
Woodley, Williams Law Firm, L.L.C.
Post Office Drawer 3731
Lake Charles, LA   70602-3731
(318) 433-6328
COUNSEL FOR DEFENDANT/APPELLANT:
        Lafayette Insurance Company

Howard Bruce Kaplan
Bernard, Cassisa & Elliott
Post Office Box 55490
Metairie, LA   71055-5490
(504) 834-2612
COUNSEL FOR DEFENDANT/APPELLANT:
        Lafayette Insurance Company

**Hunter W. Lundy**
**Lundy, Lundy, Soileau & South, LLP**
**Post Office Box 3010**
**Lake Charles, LA   70602**
**(337) 439-0707**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Clarence M. Leland**
     **Myna G. Leland**

AMY, Judge.

The plaintiffs filed suit against their property insurer, asserting that the insurer breached its duty of good faith and fair dealing in adjusting losses associated with hurricane-related damage incurred to their rental property. A jury found in favor of the plaintiffs, awarding sums it found due under the policy, statutory penalties and attorney fees, and damages stemming from the events. The insurer appeals. For the following reasons, we affirm as amended.

**Factual and Procedural Background**

The plaintiffs in this insurance dispute, Clarence "Don" and Myna Leland, own rental property in Lake Charles that was damaged during Hurricane Rita in September 2005. The property, a former home constructed in the early 1900s, had been converted for commercial purposes and was most recently rented to a bridal salon for $600.00 per month. Although the building was undisputedly damaged in the storm by a tree falling into the southern section and shearing a portion of the facade from the building, this dispute arose, at least in part, due to questions regarding the extent of that damage.

The record indicates that, by October 7, 2005, the plaintiffs notified the defendant insurer, Lafayette Insurance Company, of damage to the property and that an adjuster was assigned to the claim. The adjuster, Larry Saint, was employed by CNC Resource, an independent adjusting firm. Differences in opinions regarding the amount of storm-related damage to the property emerged. By January 2006, Lafayette tendered a check in the amount of $20,567.73 per the adjuster's estimate and deductions for depreciation and the deductible. However, Lafayette's correspondence included not only the check, but also a "Proof of Loss and Statement as to Full Cost of Repair or Replacement," which Lafayette requested the plaintiffs sign and return. The form included the following:

> This authorization to be filled out only in event proceeds of loss are to be paid to other than the insured.
>
> You are hereby requested and authorized to make payment to C.M. Leland & Myna G. Leland in consideration of which the company is discharged and released from further claim as a result of the loss herein referred to.

Although Lafayette took the position at trial that this language was inapplicable to the plaintiffs and was inadvertently left in the Proof of Loss form issued to the plaintiffs, the plaintiffs did not accept this check, or two subsequent checks, as they felt that the accompanying form constituted a release.

By March 2006, the plaintiffs' contractor, Jay Briggs, submitted an initial bid of $49,802.00 to repair the damage. According to testimony, the bid was only an initial estimate and did not include certain code upgrades later claimed necessary, nor certain fundamental components to the rebuilding that would have been determined at a later time. Internal documents from Lafayette reveal the insurer's intent to have its adjuster, Mr. Saint, contact the plaintiffs' contractor regarding the bid. Despite this intent, no agreeable solution was reached between the parties for approval of Mr. Briggs' estimate. Throughout the proceedings, Lafayette complained of what it contended was a lack of itemization in Mr. Briggs' estimate/bid.[1] The record contains no information indicating that Lafayette

---

[1] Mr. Briggs' bid itemized the following:

> Labor and materials to repair storm damages at 403 Seventh Street as follows:
>
> 1. Stump removal at corner
> 2. Demolition at corner – preparation for repairs
> 3. Structural and carpentry repairs at corner
> 4. Miscellaneous carpentry repairs at remainder of building
> 5. Glass replacement
> 6. Painting as required
> 7. Remove and replace approximately 52 squares of asphalt shingle roofing
> 8. Clean up and trash hauling.

specifically designated the way in which the bid was insufficient, instead expressing a general request for further specificity.

In July 2006, the City of Lake Charles informed the plaintiffs that the property had been deemed "a hazard to safety or health by reason of abandonment, inadequate maintenance, dilapidation, or other dangerous conditions." It listed more than five pages of corrections to various components of the house, including the foundation, which it required be remedied within fifteen days. Although the plaintiffs notified Lafayette of this development, stating that they did not want to lose their building, Lafayette responded that it had not received further itemized estimates from Mr. Briggs or other contractors. It stated that the plaintiffs failed to fully comply with the "loss conditions" portion of the policy as they had "not provided [Lafayette] with any itemized or competitive bids for repair." Lafayette further stated in this July 31, 2006 letter that, "[a]dditionally, steps must be taken to mitigate your damages and to resume your operations as quickly as possible." Lafayette also sought further documentation in support of the plaintiffs' claim for loss of rents.

Subsequently, the plaintiffs obtained and forwarded an additional roofing estimate in the amount of $12,800.00 and hired their own adjuster, Ron Rhodes of R&D Associates. Afterwards, in October 2006, the plaintiffs forwarded a Sworn Statement of Proof of Loss to Lafayette in which they sought the policy limits of $91,000.00 and a "whole loss and damage" of $102,722.21. They attached Mr. Rhodes' independent appraisal to their statement. In response, Lafayette informed the plaintiffs that it was rejecting their Proof of Loss, but indicated that it would be assigning a second adjuster to re-inspect the property. Lafayette reiterated that it had received no additional estimates from the plaintiffs' contractor.

3

Lafayette's second adjuster, Will Page, issued an appraisal in January 2007. By that time, he estimated replacement costs at $39,013.85. After reductions for depreciation and the amount of the first tendered check, Lafayette issued a second check to the plaintiffs for $15,780.33.

The plaintiffs did not negotiate this second check and again made demand for the limits of their policy. They also sought an additional $25,000.00 for the removal of debris from the property pursuant to a March 2007 resolution by the City of Lake Charles authorizing demolition procedures in May 2007 if a permit for the removal or refurbishment of the building was not obtained. Otherwise, the plaintiffs advised that they would pursue statutory penalties and attorney fees for what they contended was Lafayette's breach of its obligation of good faith and fair dealing. Lafayette denied this claim and noted that its payments to date had been $43,567.73 and that it was awaiting additional documentation for the plaintiffs' loss of rental income claim.

By the end of April 2007, with the City of Lake Charles' deadline approaching, the plaintiffs sought a supplemental appraisal from its independent adjuster in light of a variety of "code upgrades" required by the City for reconstruction. Thereafter, the plaintiffs again demanded the policy limits and an additional $25,000.00 they alleged the policy covered for the code upgrades. Lafayette again informed the plaintiffs of its denial of their claim as it "determined that the damage listed has either been considered" or that it "claimed non-covered damages." Lafayette notified them that, in order to resolve the dispute, it would be sending a structural engineer to inspect the property.

After the denial of the claim, the plaintiffs obtained financing in order to perform the necessary renovations to the building ahead of the City's deadline.

4

The plaintiffs ultimately contended that the renovation expenses exceeded $171,000.00. At one point, in June 2007, Lafayette issued a final payment in the amount of $505.80 as a "supplement for fascia, soffit and ceiling molding." However, the remainder of the claim was denied.

The plaintiffs filed this matter in September 2007, seeking not only its policy limits, but statutory penalties and attorney fees as well. The plaintiffs named Lafayette Insurance Company and the insurance agency that obtained the Lafayette policy for the plaintiffs as defendants. The latter defendant was subsequently dismissed.

Ultimately, a jury found in favor of the plaintiffs, concluding that the plaintiffs sustained losses in excess of the amount paid under the defendant's policy in the amount of $144,800.00. Further, the jury concluded that the defendant: 1) failed to initiate a loss adjustment to the property within thirty days after notification of loss; 2) was arbitrary, capricious, or without probable cause in failing to pay any claim due within sixty days after receipt of satisfactory proof of loss; 3) failed to make an offer to settle the property damage within thirty days of receipt of satisfactory proof of loss; and 4) misrepresented pertinent facts or insurance policy provisions related to coverage at issue.

With regard to damages, the jury awarded $5,000.00 for loss of rental income, $53,000.00 for loss of personal income, and $30,000.00 in interest. The jury awarded Mr. and Mrs. Leland $45,000.00 each for their mental anguish and emotional distress. Due to its findings regarding Lafayette's conduct, the jury awarded $645,600.00 in penalties and $319,572.00 as attorney fees. The judgment totaled $1,287,972.00.

Lafayette appeals, assigning the following as error:

[1.]    The trial court erred in awarding attorney fees.

[2.]    The trial court erred in using contractual damages in the calculation of penalties.

[3.]    The trial court erred in allowing expert testimony.

[4.]    The jury erred in awarding consequential damages.

## Discussion

*Statutory Penalties and Attorney Fees*

As seen above, the jury determined that Lafayette breached a number of statutory duties required by either La.R.S. 22:658 or La.R.S. 22:1220.[2] While these statutes are discussed separately below, it is an important starting point to recognize the close relationship of the two statutes and the availability of penalties and/or attorney fees. *See, e.g., Calogero v. Safeway Ins. Co. of La.*, 99-1625 (La. 1/19/00), 753 So.2d 170.

Of particular note, and as related to the jury's findings in this case, certain similar conduct is prohibited by both statutes. For example, both penalize an insurer's failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause. *See* La.R.S. 22:658(A)(1); La.R.S. 22:1220(B)(5). The length of prohibited delays differs under the statutes. Under La.R.S. 22:658(A)(1), the insurer must pay the claim within thirty days of receiving satisfactory proof of loss, whereas La.R.S. 22:1220(B)(5) penalizes the insurer's failure to pay the claim within sixty days.

The jury in this case determined that, among other breaches of designated statutory duties of good faith and fair dealing, Lafayette was arbitrary, capricious,

---

[2] Effective January 2009, La.R.S. 22:658 was re-numbered as La.R.S. 22:1892. Louisiana Revised Statutes 22:1220 was re-numbered as La.R.S. 22:1973. For consistency of discussion, this opinion retains the numbering in use at the time of the underlying events.

6

or without probable cause in failing to pay the amount of any claim due the Lelands within *sixty days* after receipt of satisfactory proof of loss. Thus, because this time period is inclusive of the thirty-day delay, the penalty provisions of both La.R.S. 22:658(A)(1) and La.R.S. 22:1220(B)(5) are implicated. However, the supreme court has confirmed that La.R.S. 22:1220 supersedes La.R.S. 22:658 when the former statute provides the greater penalty and that a plaintiff cannot recover penalties under both statutes. *See Calogero*, 753 So.2d 170. Yet, because La.R.S. 22:1220 does not provide for an attorney fee, a plaintiff otherwise proving entitlement to recovery under La.R.S. 22:658 can recover an attorney fee thereunder. *Id.*

This relationship between La.R.S. 22:658 and La.R.S. 22:1220 is seen in the present case. Here, the jury found breaches of the duties owed under both statutes and, as a result, awarded an attorney fee, available under La.R.S. 22:658, and a penalty pursuant to La.R.S. 22:1220. We turn to consideration of each.

*Attorney Fees*

<u>Availability</u>

As for the award of attorney fees, Lafayette's first assignment concerns the version of La.R.S. 22:658 applicable in this case. As stated above, the jury not only determined that Lafayette failed to pay the insurance claim in a timely fashion, it further determined that Lafayette violated the duty that an insurer "shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim." La.R.S. 22:658(A)(4). However, the penalties stemming from the breach of those duties has changed during the course of this claim.

At the time of Hurricane Rita, in September 2005, La.R.S. 22:658(B)(1)[3] permitted recovery of a 25% penalty and did not provide for the recovery of attorney fees. Effective August 15, 2006, however, the legislature amended La.R.S. 22:658(B)(1)[4] to permit recovery of a 50% penalty *and attorney fees*. This amendment does not apply retroactively. *Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08), 988 So.2d 186; *Durio v. Horace Mann Ins. Co.*, 11-84 (La. 10/25/11), _ So.3d _.

Lafayette contends that the plaintiffs' cause of action in this case came into existence at the time of Hurricane Rita, in September 2005, and, thus, existed prior

---

[3] In September 2005, La.R.S. 22:658(B)(1) provided:

> Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand thereof or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of *twenty-five percent damages* on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, *twenty-five percent* of the difference between the amount paid or tendered and the amount found to be due.

(Emphasis added.)

[4] Pursuant to 2006 La.Acts No. 813, La.R.S. 22:658(B)(1) was amended to provide that:

> Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand thereof or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of *fifty percent* damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, *fifty percent* of the difference between the amount paid or tendered and the amount found to be due *as well as reasonable attorney fees and costs.* Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

(Emphasis added.)

to the August 2006 amendment. Basing its argument upon *Sher*, 988 So.2d 186, Lafayette asserts that the attorney fees as awarded were not permissible.[5] The plaintiffs contend, however, that the evidence supports the view that Lafayette's actions after August 15, 2006 violated the statutory duty owed and, therefore, the award of attorney fees was appropriate.

In *Sher*, 988 So.2d 186, the supreme court addressed a claim arising from damages incurred in August 2005 from the effects of Hurricane Katrina. The plaintiff in that case asserted that he was entitled to the additional penalties provided by the 2006 amendments to La.R.S. 22:658 insofar as the insurer's breach of the duty of good faith and fair dealing in paying the claim continued after the statute was amended. Although the supreme court recognized, in *Sher*, that an insurer "has a continuing duty of good faith and fair dealing which extends throughout the litigation period," it observed that the plaintiff's claim "first arose prior to the amendment of R.S. 22:658." *Id.* at 199. Therefore, the supreme court rejected the plaintiff's argument that the continuing breach of duty of good faith and fair dealing subjected the insurer to post-amendment penalties and attorney fees. *Id.*

However, the present case is factually distinguishable from *Sher*. The plaintiffs in this case did, in fact, report damage to the insurer soon after the September 2005 storm. Yet, whether by virtue of the parties' own actions/inactions, or by virtue of later-uncovered damage, the plaintiffs' demands and their presentation of satisfactory proof of loss gradually unfolded. In fact, as evidenced by the timeline above, most of the activity in this case occurred after the

---

[5] Of course, the percentage of damages available as a penalty under the statute is irrelevant to this discussion insofar as the damages awarded as penalty in this case were made pursuant to La.R.S. 22:1220, discussed below. Only the availability of attorney fees is at issue in this assignment.

August 15, 2006 effective date of the amendment to the statute. The plaintiffs did not obtain their own adjuster and file their *first* Proof of Loss seeking policy limits until October 2006. Various reports, appraisals, estimates, and the demand for code upgrades required by the City followed thereafter. The petition instituting this matter was not filed until September 2007.

This series of events, most of which occurred after the amendment to La.R.S. 22:658, is consistent with the supreme court's statement that:

> Because the duty is a continuing one, had plaintiff not first made satisfactory proof of loss prior to the amendment of R.S. 22:658, his petition for damages served after the amendment became effective could have served as satisfactory proof, thereby triggering the time period set forth in the statute and could have subjected Lafayette to the penalties contained in the amendment because the claim would have first arisen *after* the amendment. Further, again because the duty is a continuing one, had plaintiff made satisfactory proof of loss prior to the amendment and had Lafayette paid that claim, and had plaintiff discovered new damage and made satisfactory proof which Lafayette failed to pay within the time period contained in the statute, but after the amendment became effective, Lafayette could have been subject to the penalties contained in the amendment because the claim would have arisen *after* the effective date of the amendment.

*Sher*, 988 So.2d at 199. *See also Durio*, _ So.3d _.

Given the timeline of this case, we find no error in the judgment's inclusion of attorney fees based upon application of the amendment to La.R.S. 22:658.

Quantum

Under this assignment, Lafayette also asserts that the attorney fee, awarded in the amount of $319,752.00, is excessive. Although it does not further address the award or specify in what way it is excessive, Lafayette seeks a reduction.

The record indicates that the plaintiffs retained counsel through a contingency contract for thirty-three and one-third percent of the recovery procured. The judgment rendered, absent the attorney fee, totaled well over

$900,000.00. Thus, the attorney fee awarded is in keeping with the contractual arrangement and is reflective of the multiple-year litigation involved in this suit and the week-long trial resulting in the judgment under review. The representation is evidenced by the fifteen-volume record filed in this appeal. However, we do find it necessary to amend the attorney fee awarded insofar as the jury's award was based, in part, on a penalty which impermissibly included contractual damages, as discussed below.

Thus, we revise the attorney fee to take into consideration our amendment to the penalty awarded. Given the amended judgment resulting from this opinion and counsel's contingency contract for thirty-three and one-third percent of the recovery procured, we reduce the attorney fee award to $226,266.67.[6]

*Penalties*

In addition to attorney fees, the jury awarded penalties in the amount of $645,600.00. Lafayette contends that the jury calculated the penalty incorrectly under La.R.S. 22:1220 insofar as it included the amount found due under the insurance policy.[7] Louisiana Revised Statutes 22:1220 provides that:

> A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. *Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.*

---

[6] The amended judgment resulting from this opinion totals $678,800.00. The figure is comprised of $144,800.00 in contractual damages, $178,000.00 in special and general damages, and $356,000.00 in penalties arising under La.R.S. 22:1220. Thus, attorney fees of thirty-three and one-third percent of the total recovery procured ($678,800.00) are $226,266.67.

[7] The $645,600.00 penalty awarded by the jury equals two times the total amounts awarded under the insurance policy ($144,800.00), for loss of rental income ($5,000.00), loss of personal income ($53,000.00), interest incurred ($30,000.00) and the total sum due for mental anguish and emotional distress ($90,000.00).

B.     Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:

(1)     Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.

(2)     Failing to pay a settlement within thirty days after an agreement is reduced to writing.

(3)     Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.

(4)     Misleading a claimant as to the applicable prescriptive period.

(5)     Failing to pay the amount of any claim due to any person injured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

(6)     Failing to pay claims pursuant to La.R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.

C.     *In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater . . . .*

(Emphasis added.)  Thus, La.R.S. 22:1220 provides for damages as a breach of the duties of good faith and fair dealing described therein[8] *and* for a penalty calculated

---

[8] The jury found that Lafayette breached the duties imposed by La.R.S. 22:1220(B) in three respects as revealed by the jury's "Yes" response to each of the following inquiries on the jury interrogatories:

3.   Do you find by a preponderance of the evidence that:

. . . .

(b) Lafayette Insurance Company was arbitrary, capricious, or without probable cause in failing to pay the amount of any claim due the Lelands within sixty (60) days after receipt of satisfactory proof of loss?

(c) Lafayette Insurance Company failed to make an offer to settle the property damage claim within thirty (30) days of receipt of satisfactory proof of loss?

(d) Lafayette Insurance Company misrepresented pertinent facts or insurance policy provisions related to any coverages at issue?

12

at two times the damages sustained.

Lafayette claims that, in calculating the penalty due, the jury should have included only non-contractual damages sustained as a consequence of the underlying breach. It notes that La.R.S. 22:1220(A) provides that any insurer is "liable for any damages *sustained as a result of the breach*." (Emphasis added.) Lafayette argues that the amount due under the contract cannot be considered a damage sustained as a result of the breach of its duties. In light of the supreme court's recent pronouncement in *Durio*, Lafayette's argument on this point has merit.

In *Durio*, _ So.3d _, the supreme court observed that La.R.S. 22:1220(A) provides for the mandatory award of those damages "sustained as a result of the breach" of the duty imposed by the statute, whereas Paragraph (C) provides for a penalty of two times the damages sustained or $5,000, whichever is greater. The supreme court explained, in part, that "[c]onsidering the statute in its entirety and applying the words of the statute as written, the only logical reading is that the '*damages sustained*' in Section (C) are the same '*damages sustained as a result of the breach*' in Section (A)." *Id. at _*.

Additionally, a comparison of the wording of La.R.S. 22:658 and La.R.S. 22:1220 indicates that contractual damages are not to be included in the calculation of the penalty available under the latter statute insofar as La.R.S. 22:658 specifically refers to those damages whereas La.R.S. 22:1220 does not. *Durio*, _ So.3d _. If the legislature had intended for La.R.S. 22:1220 penalties to "be calculated based on the amount due under the contract, it would have easily and clearly stated so . . . as it did in La.R.S. 22:658." *Id. at _*. Thus, in *Durio*, the supreme court amended a penalty award which had included contractual damages

in the calculation. *Id.*

In keeping with the wording of La.R.S. 22:1220, as well as the pronouncement in *Durio*, _ So.3d _, we amend the judgment to include a penalty of two times the amount of damages attributable to the breach of Lafayette's duties under the statute. In this case, those damages total $178,000.00.[9] Accordingly, we amend the judgment to reflect a penalty of $356,000.00.

*Expert Testimony*

In the presentation of their case, the plaintiffs presented the reports of its independent appraiser, Ron Rhodes, and the expert testimony of Cal Chambers, accepted as an expert in the field of insurance adjusting, and that of Charles Norman, accepted as an expert in the fields of civil and mechanical engineering with a subspecialty in wind engineering.

Chambers Testimony

Throughout the proceedings, Lafayette objected to the references to Mr. Rhodes' appraisals/reports insofar as he was not present due to health concerns. The majority of the information is included in Lafayette's claims file and attached to the plaintiffs' Proofs of Loss filed with Lafayette. Central to Lafayette's claim is Mr. Chambers' testimony regarding these reports. Mr. Chambers explained during his testimony that he previously worked with Mr. Rhodes at R&D Associates as an independent contractor. He was thereafter permitted to explain some aspects of Rhodes' appraisals. However, Lafayette argued below that this was insufficient to overcome the underlying hearsay issue, particularly in light of the fact that Mr. Chambers had not worked with R&D since 2008 and he had no

---

[9] This figure is comprised of the awards for loss of rental income ($5,000.00), loss of personal income ($53,000.00), interest ($30,000.00), and mental anguish and emotional distress (a total of $90,000.00).

underlying knowledge regarding the preparation of Mr. Rhodes' appraisals or the methodology used. Lafayette re-urges this argument on appeal, asserting that the reports themselves and Mr. Chambers' testimony, to the extent he relied on or explained portions of the reports, should have been excluded.

In denying Lafayette's objection in this regard, the trial court determined that the complained-of hearsay issue was overcome in light of Mr. Chambers' identification of certain aspects of the reports. Considering the context of the references to the subject appraisals and their entry into the record, we do not disturb this ruling on review.

Rather, we are mindful that Mr. Leland, himself, testified regarding his hiring of Mr. Rhodes and the atmosphere in which his reports were obtained. Additionally, Mr. Chambers, testifying as an expert in the field of insurance adjusting, was able to explain the extent to which he relied upon the inclusions in the reports. In this regard, La.Code Evid. art. 702 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

As for the remainder of Lafayette's objections to Mr. Chambers' qualification as an expert witness, we find no error in the trial court's ruling or in the introduction of his testimony. Mr. Chambers explained that he personally inspected the building and prepared his own damage assessment and appraisal. Although he did not see the building prior to repair, a chief concern of Lafayette, he reviewed photographs of its pre-repair condition. He also had access to the engineer's report, among other documents and depositions. The jury was made

15

aware of the timing of his visit and his reliance on certain materials, including the photographs. It was, therefore, able to weigh this evidence as it deemed appropriate.

Norman Testimony

Neither do we find merit in Lafayette's assertion that the trial court erred in permitting Charles Norman to testify regarding his damage assessment of the building. Lafayette places its concern regarding Mr. Norman's opinion testimony in the context of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). It asserts that Mr. Norman's opinions were unreliable under the *Daubert* analysis due to several factors, including the fact that he did not inspect the premises until after the renovations were made and that he performed certain calculations after his report was written and these calculations were based on assumptions regarding the weight of the tree that fell onto the building.

We reject Lafayette's argument in this regard. Although the transcript from the pre-trial hearing on the admissibility of the experts' testimony is not contained in the record, neither the exhibits filed into the record at that time nor the transcript from the trial of this matter indicate that Mr. Norman's testimony regarding the tree's impact on the house was erroneously admitted. The trial court was able to consider the factors reviewed by Mr. Norman in issuing his report and his related opinion regarding his appreciation of the effects of the tree's impact. As with Mr. Chambers' testimony, the jury was able to consider the weight it determined was appropriate for Mr. Norman's testimony in light of the fact that his estimates were based on a post-repair inspection of the property and related materials.

This assignment of error lacks merit.

*Damages*

In its final assignment, Lafayette contests the jury's awards of mental anguish damages and those for lost income.

Mental Anguish

First, Lafayette does not question the availability of mental anguish damages following a violation of La.R.S. 22:1220,[10] now La.R.S. 22:1973. Instead, it asserts that the plaintiffs did not present sufficient evidence to support the individual awards of $45,000.00 to each of them. Primarily, Lafayette asserts that the figure is not supported as they did not present medical support for their claims.

We do not disturb the jury's award in this regard, finding adequate support in the record. Both plaintiffs offered testimony on this element of recovery. Mr. Leland testified extensively regarding the frustrations encountered in pursuing this multi-year claim and in making little progress toward a satisfactory conclusion. The record is replete with repeated and persistent inquiries and demands regarding his property, which remained unrepaired by him in light of the insurer's actions and the financial commitment required. The stressful circumstances created by the situation are evident from the documentary evidence and from his testimony. Additionally, he testified that this property and its rental income were intended to serve as a retirement investment for the couple. Rather than being able to rely on that investment, they were without rental income for years and had to, eventually, borrow more than $142,000.00 for the repairs in order to avoid having it destroyed by the City. He explained that this process was particularly difficult for his wife, who was reluctant to accept the debt. Mrs. Leland testified regarding the "constant worry of that burden."

_____

[10] The Supreme Court of Louisiana has recently confirmed the availability of mental anguish damages under this statutory provision. *Wegener v. Lafayette Ins. Co.*, 10-810 (La. 3/15/11), 60 So.3d 1220.

Both plaintiffs testified regarding the negative impact that the events had on their relationship. Mr. Leland explained that they had both gained weight and that they "don't sleep." He further stated that "[t]he lack of sleep is one of the hard things because when you don't sleep you don't feel good, and when you don't feel good you fight." Mrs. Leland explained that her husband did not talk as much as he used to and that he no longer golfed or fished as he once had. She stated that: "The marriage will make it because we made a commitment 40 years ago, but it is not the marriage we had. It's not the marriage we thought we would have at this point in life. He doesn't talk very much, he doesn't talk to me."

In light of this testimony and the evidence in the record regarding the plaintiffs' pursuit of their insurer in having their claims satisfied, the jury's award is supported by the record.

Lost Wages

Lafayette also contests the jury's award of $53,000.00 for "loss of personal income." It contends that there was no basis for this award in the record other than Mr. Leland's uncorroborated testimony. Lafayette correctly identifies the fact that the majority of the evidence on this element of damages came from Mr. Leland himself. However, both Mr. Leland's testimony and the record as a whole support the underlying award.

Mr. Leland, an attorney practicing in Mississippi, testified that in pursuing the repairs to the property he documented in excess of $53,000.00 in loss of billable hours spent on the project. He further stated that he did not document all of his work on his accounting software. In addition to the evidence and correspondence in the record revealing his work on pursuit of the policy proceeds, Mr. Leland further worked on the rebuilding effort himself. Although Shawn

18

Hunt, a builder from Mississippi, travelled to Lake Charles to handle the labor aspect of the job, Mr. Leland testified that he personally "handled the materials." Mr. Hunt confirmed that Mr. Leland handled not only the expenses, but that Mr. Leland did some of the physical labor himself, hauling metal to the site for the roof and coming from Mississippi "several times."

Given this testimony, we find Mr. Leland's testimony regarding his lost wages sufficiently supported in the record.

Lafayette's final assignment lacks merit.

## DECREE

We amend the judgment to reflect an award of penalties in the amount of $356,000.00 and an award of attorney fees in the amount of $226,266.67. In all other areas of recovery, the judgment of the trial court is affirmed. Costs of this proceeding are assessed equally to the appellees, Clarence and Myna Leland, and to the appellant, Lafayette Insurance Company.

**AFFIRMED AS AMENDED.**